UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
                                           :

REAL NEWS PROJECT, INC.,              :

                                            :

                     <u>Plaintiff</u>,        :

                                            :        06 Civ. 4322 (GEL)

         -against-               :

                                            :      **OPINION AND ORDER**

INDEPENDENT WORLD TELEVISION, INC.,   :

                                            :     **FINDINGS OF FACT**

                     <u>Defendant</u>.     :  **AND CONCLUSIONS OF LAW**

                                            :

----------------------------------------------------------------x

Rebecca Hughes Parker, Martin P. Michael,
Sonnenschein Nath & Rosenthal LLP, New York, NY,
Dianne Smith-Misemer, Rebecca Stroder,
Sonnenschein Nath & Rosenthal LLP, Kansas City,
MO, <u>for plaintiff</u>.

Jared Briant, Natalie Hanlon-Leh, Jennifer Daniel
Collins, Faegre & Benson LLP, Denver, CO, Jonathan
Zavin, Christian D. Carbone, J. Ryan Miller, Loeb &
Loeb LLP, New York, NY, <u>for defendant</u>.

GERARD E. LYNCH, <u>District Judge</u>:

      On June 8, 2006, Real News Project, Inc., ("RNP") filed this action against Independent

World Television, Inc., ("IWT") for alleged trademark infringement and unfair competition, in

violation of federal and New York state law. RNP runs a news website – "The Real News

Project," available at realnews.org.[1] IWT also runs a news website – "The Real News Network,"

---

[1] For the reader's ease, throughout the text the world wide web designation "www." is omitted where the text refers to a website address. For example, www.realnews.org is referred to as realnews.org.

available at therealnews.com, realnews.com, getrealnews.org, and realnewsnetwork.com.[2]  RNP

produces and posts on its website a video news program called "The Real News."  The case was

tried before the Court without a jury on April 1-2, 2008.

The following constitutes the Court's findings of fact and conclusions of law, in

accordance with Rule 52(a), Fed. R. Civ. P.  To the extent any finding of fact reflects a legal

conclusion, it shall to that extent be deemed a conclusion of law, and vice versa.  As detailed

below, the Court finds that RNP has failed to prove that its marks are sufficiently distinctive to

merit trademark protection.  The Court further finds that RNP has failed to prove that, were

RNP's marks properly classified as distinctive, there would be a likelihood of confusion were

RNP's and IWT's websites to co-exist in the marketplace.  Therefore, judgment will be entered

in favor of IWT on all counts.

## FINDINGS OF FACT: HISTORICAL FACTS[3]

I.      <u>The Parties</u>

1.  RNP is a corporation organized under the laws of the State of New York.  (Plaintiff's

Trial Exhibit ("PTX") 48, Stipulated Facts, Joint Pretrial Order § X ("Stip'd Facts"), ¶ 1.)

2.  IWT is a Canadian New York non-profit 501(c)(3) organization.  (Stip'd Facts ¶ 3.)

3.  IWT does business in this district and in other jurisdictions in the United States, and

this Court has personal jurisdiction over it.

---

[2] Although the parties refer to this website as realnewsnetwork.com, therealnewsnetwork.com appears to be the currently operative address.

[3] The Court makes its findings of fact based on the evidence of record, reasonable inferences drawn therefrom, assessment of credibility and demeanor, and resolution of any conflicts in the evidence.  Citations to exhibits and testimonial evidence indicate some but not necessarily all of the direct evidence pertaining to a given finding.

II.     Jurisdiction and Venue

4.  RNP's action against IWT arises under the trademark laws of the United States of America, and this Court has subject matter jurisdiction under 15 U.S.C. § 1121, 28 U.S.C. § 1331, 28 U.S.C. § 1338(a) & (b), and 28 U.S.C. § 1367.

5.  Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) & (d).

III.    Nature of the Action and Procedural History

6.  On June 7, 2006, RNP filed this action against IWT.

7.  RNP initially asserted five claims against IWT: (1) unfair competition in violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); (2) cybersquatting in violation of § 43(d) of the Lanham Act, 15 U.S.C. § 1125(d); (3) New York common law trademark infringement;  (4) New York common law unfair competition; and (5) use by IWT of RNP's marks with the intent to deceive in violation of § 133 of the General Laws of New York.  (Compl. ¶ 3.)

8.  Only the federal unfair competition claim and the New York common law claims remain at issue, as RNP has abandoned the other claims.[4]

9.  RNP has disclaimed any interest in monetary relief, and seeks only injunctive relief. (Tr. 219.)

---

[4] Although RNP's complaint initially alleged violations of "cyberpiracy" provisions of federal law (see Compl. ¶ 3), RNP made no mention of the federal cybersquatting claim or the New York State intent-to-deceive claim in its portion of the pretrial order, or in its pretrial memorandum or proposed findings of fact and conclusions of law, and has therefore abandoned these claims.  See Zhang v. Gonzales, 426 F.3d 540, 542 n.1 (2d Cir. 2005).

IV.     Background of the Dispute

        A.     Real News Project

10.   RNP is a non-profit news organization founded by Russ Baker.  (Stip'd Facts ¶ 1.)
Along with colleagues, Baker developed the organization to produce independent investigative
journalism.  (Affidavit of Russell Baker, dated March 14, 2008, ¶¶ 9-10, 12-13.)

11.   Baker began to describe himself as the founder of the "Real News Project" as early
as June 29, 2005, in bylines of published articles.  (See PTX 31.)  Baker describes the project as
"a new nonprofit . . . dedicated to investigative journalism" (id.), or "a new organization
dedicated to revitalizing investigative journalism" (PTX 24).

12.   On August 29, 2005, Baker, on behalf of the Real News Project, applied for its first
grant.  (PTX 47.)  In the meantime, Baker acquired the domain name realnews.org.  (Baker Aff.
¶ 20.)  Baker also tried to acquire the domain name realnews.com, but was unsuccessful.  (Id.
¶ 19.)  On January 27, 2006, Baker incorporated RNP under the laws of New York State (id.
¶ 22), and on February 6, 2006, RNP launched its website at realnews.org (Stip'd Facts ¶ 6).

13.   Since its launch, the website has posted four original stories: a report on Hurricane
Katrina, an investigation of consultants affiliated with the Democratic Party, an investigation of
early CIA connections of George H. W. Bush, and an investigation of a significant Hillary
Clinton campaign contributor.  (Stip'd Facts ¶ 7.)

14.   Although the website also links to news stories, including video and radio content
(id.), its primary original content has been the four investigative articles.

B.     Independent World Television

15.   Paul Jay founded IWT in 2005 as a viewer-funded news and documentary network, and launched the IWT website at iwtnews.com in the summer of 2005.  (Corrected Affidavit of Paul Jay, dated March 20, 2008, ¶ 6.)

16.   The site provides video programming.  (Stip'd Facts ¶ 12.)

17.   In Fall 2005, Luke Montgomery, IWT's former director of marketing, told Jay that "he had to change . . . IWT's name, or at least the name of its flagship television program." (Affidavit of Luke Montgomery, dated March 14, 2008.)[5]

18.   One of Montgomery's suggestions for IWT's rebranding, initially made around October 25, 2005, was "The Real News."  (Id. ¶ 5; Tr. 142.)  Montgomery solicited input from IWT's board members, advisory committee and employees.  (Id. ¶ 8.)  On January 27, 2006, Thomas Fenton, an IWT board member, suggested the name "Real News" – because "that would imply hard news, absence of fluff and infotainment, news that is meaningful, etc."  (Defendant's Trial Exhibit ("DTX") A-1.)

19.   Montgomery and Jay searched the Internet for potential domain names for IWT's new website and to determine whether other users of the term "Real News" existed.

_____

[5] Montgomery "made [it] a condition of [his] hiring that [IWT] would change the name or at least very seriously take a crack at changing the name."  (Tr. 185.)  Montgomery did not like IWT because it was ambiguous and did not stand out: "What does it stand for?  Is it International World Television? Is it Independent World Television?  There is some confusion there.  It doesn't stand out from ABC, CNN, NBC, MSNBC.  It's just alphabet soup."  (Id. 158.) Montgomery preferred the name "Real News" because "in a flock of flamingos the best way to stand out is to be a plain pidgeon [sic]," and the term's "plain nature, its lack of sizzle, and the fact that it was just so common was what . . . made it stand out."  (Id. 159-60.)  Jay initially did not like the term "Real News" because "it felt a little too light" and Jay "wanted to have the sense of some gravitas.  We wanted to sound institutional.  Independent World Television sounded institutional.  It sounded big."  (Id. 186.)

(Montgomery Aff. ¶ 10.)  They came across RNP's website on February 7, 2006, the day after its launch.  (Id. ¶ 12; Stip'd Facts ¶ 8.)

C.  The Initial Conversation Between Jay and Baker

20.  Soon thereafter, Jay emailed Baker, introducing himself and IWT.  (Stip'd Facts ¶ 8; PTX 9.)

21.  Jay and Baker spoke via telephone on February 14, 2006.  (Stip'd Facts ¶ 10.)

22.  According to Jay, Baker "gave no indication whatsoever that he objected to our use of the phrase 'real news.'"  (Jay Aff. ¶ 25.)  The conversation "was all a discussion about how we could make the best of the situation for both of us."  (Tr. 176.)

23.  Baker, in contrast, testified that he "expressly [told] Mr. Jay that, possible cooperation notwithstanding, I found problematical the notion that he might use the same name for his operation as we were using."  (Baker Aff. ¶ 32.)  On Baker's account, Jay suggested ways the websites could address any confusion between each other, such as through a frequently asked questions page, and noted that Jay "anticipated a very sizeable budget . . . [and] could help [the RNP] venture."  (Id.)  They agreed to have another conference call.  (Id.)

D.  Events Following the First Call

24.  The day after that first telephone conversation – Wednesday, February 15, 2006 – Jay emailed the IWT board members stating that he and Montgomery had "come up with what we think is a good new name for our project" – "The Real News," with a website address of therealnews.com.  (Jay Aff. ¶ 19; PTX 10.)  Jay solicited feedback from the board members, asking them if they were in favor of the new name and whether they "want[ed] to have a conference call about it" or instead were "willing to sign off on it now knowing there will be

more detailed discussion at the next board meeting on how to present the new name, graphics, and other such considerations."  (PTX 10.)  Jay asked the board members to "reply by end of Thursday if possible."  (Id.)

25.  Three days after that first telephone conversation – February 17, 2006 – Baker applied, on his own behalf, to the U.S. Patent and Trademark Office ("PTO") for recognition of REALNEWS, Serial No. 78817982 (PTX 58), REAL NEWS, Serial No. 78817994 (PTX 59), and THE REAL NEWS PROJECT, Serial No. 78818009 (PTX 60), as valid and protectable marks to be placed on the PTO's principal register.  (Stip'd Facts ¶ 10.)[6]

26.  The applications were initially rejected as descriptive.  (PTX 58-60.)  The examiner recommended that Baker disclaim the phrase REAL NEWS apart from the mark THE REAL NEWS PROJECT "because [REAL NEWS] merely describes the subject matter of the applicant's services."  (PTX 60.)[7]

---

[6]  Later, Baker assigned his interest in the marks to RNP.  (Baker Aff. ¶ 29.)

[7]  "Disclaimer is a well recognized practice in trademark registration."  Genesee Brewing Co., Inc. v. Stroh Brewing Co., 124 F.3d 137, 141 n.2 (2d Cir. 1997).  As both the Second Circuit and the Trademark Trial and Appeal Board have recognized,

> [W]hile an entire mark cannot be disclaimed and also registered, nevertheless, where the unregistrable components of a mark are combined in a design or display which is so distinctive as to create a commercial impression separate and apart from the unregistrable components, it is possible to disclaim those unregistrable components and still have a mark which is registrable as a whole.

Courtenay Communications Corp. v. Hall, 334 F.3d 210, 216 (2d Cir. 2003), quoting United States Lines, Inc. v. American President Lines, Ltd., 219 U.S.P.Q. 1224, 1227 (T.T.A.B. 1982).

27.  Baker formally requested that the examiner reconsider his application on the grounds that REAL NEWS was suggestive, not descriptive, arguing that "[w]here there is doubt on the question of descriptiveness, that doubt is to be resolved in applicants's behalf and the mark should be published for opposition."  (Id., citing In re Rank Organisation Ltd., 222 U.S.P.Q. 324, 326 (T.T.A.B. 1984).)  Baker disclaimed NEWS but not REAL NEWS.  (Id.)

28.  On the basis of that submission, the examiner approved the three marks for publication without requiring Baker to demonstrate the existence of any secondary meaning.  (Stip'd Facts ¶ 10.)  The PTO published the applications for opposition in May and July 2007; IWT filed oppositions to those applications.  (Id.)  After RNP sued IWT, the Trademark Trial and Appeal Board suspended the opposition proceedings pending the outcome of this case.  (Id.)  The marks thus remain unregistered.

29.  Nine days after that first telephone conference between Baker and Jay – February 23, 2006 – IWT's board of directors met and formally approved the name "The Real News" (subject to the condition that Rob Glazer, owner of Real Networks, maker of the Real Player, had no objection to the name).  (Jay Aff. ¶¶ 27, 29.)[8]

E.  The Second Call

30.  Baker and Jay spoke again by telephone on March 3, 2008.  (Stip'd Facts ¶ 9.)

31.  According to Baker, during that conversation it "readily became apparent that all Mr. Jay was really prepared to do was offer several thousand dollars to us and to go his separate way."  (Baker Aff. ¶ 33.)

---

[8] One IWT board member noted that Real News "may connect for many people . . . with Rob Glazer's Real Networks (realaudio – realplayer – etc.)" and another was concerned that this "may raise legal issues from [R]eal [N]etworks."  (PTX 10.)

32.  In contrast, Jay testified that Baker's attorney asked him if IWT would consider paying a royalty or license fee for the name.  (Jay Aff. ¶ 31.)  Jay also "learned for the first time that three days after [their] initial discussion Mr. Baker filed trademark applications for the RNP Marks."  (Id. ¶ 30.)  According to Jay, that call "was the first suggestion that there would be an objection" to IWT's use of the term "real news," but "by the end of the phone call [Jay] actually thought [they] had come to a conclusion and did not think there was still an objection."  (Tr. 176.)

F.  Events Following the Second Call

33.  That same day, however, March 3, 2008, IWT filed a trademark application for "THE REAL NEWS" with the PTO, Serial No. 78828366.  (PTX 62; Tr. 176.)  IWT's application was eventually rejected by the examiner in part because it was descriptive.  (PTX 62.)  IWT did not seek reconsideration of this decision.

34.  Some days after the March 3 conversation, Jay received a letter from RNP seeking a license fee and asking IWT to stop using the phrase "real news" until a deal could be worked out.  (Tr. 200.)  According to Jay, "[a]ll of a sudden it became about nothing but money."  (Id.)

35.  On March 17, 2006, one month after Baker's applications to the PTO, IWT applied to the New York Department of State to reserve the name "The Real News, Inc."  (Stip'd Facts ¶ 11.)

36.  On February 5, 2006, IWT had acquired the domain name getrealnews.org, soon thereafter it acquired therealnews.com, and some months later realnews.com.  (Tr. 165, 166,

178.)  On June 17, 2007, IWT purchased the domain name realnewsnetwork.com.  (Stip'd Facts ¶ 15.)[9]

37.  In June 2007, approximately one year after RNP's lawsuit had been filed, IWT began posting content on its website, available at therealnews.com.  (Stip'd Facts ¶ 14.)  IWT's other websites – iwtnews.com, getrealnews.org, realnewsnetwork.com, and realnews.com – redirect to therealnews.com.  (Jay Aff. ¶ 44.)

V.    Credibility Findings

38.  While many facts are undisputed, one central dispute involves what exactly was said during the conversations between Baker and Jay.  Jay's credibility is also important to any finding regarding IWT's good faith (or lack thereof) in adopting the phrase "Real News" as part of its rebranding efforts.

39.  In general, the Court finds both Baker's and Jay's testimony to be credible, even though their testimony regarding their first conversation is fundamentally inconsistent.  (Tr. 288-89.)  Oftentimes two people may have very different impressions of the same conversation, and what one person may think of as a firm but diplomatic way of putting his foot down, another may think of as a timid, tentative, or partial acceptance.  It is reasonable under all the

_____

[9]  IWT also purchased from NetDive Inc. its rights to the marks REAL NEWS - BY REAL PEOPLE, REAL NEWS NETWORK, and REALNEWSNETWORK.COM.  (Stip'd Facts ¶ 15.)  IWT has asserted as a defense in this action that it is the senior user of the REAL NEWS mark by virtue of its purchases from NetDive, an allegedly senior user.  This defense must fail, as the Court has already found there to be no credible evidence in the record that realnewsnetwork.com, as operated by NetDive, was operational in any meaningful sense at any time after 2003.  (See Tr. 225.)  "There is no such thing as property in a trade-mark except as a right appurtenant to an established business or trade in connection with which the mark is employed."  United Drug Co. v Theodore Rectanus Co., 248 U.S. 90, 97 (1918).  Even assuming NetDive at some point had a valid right to the marks at issue, its non-use of those marks for three consecutive years is "prima facie evidence of abandonment."  15 U.S.C. § 1127.

circumstances to conclude, and the Court so finds, that based on the first conversation alone, Jay

honestly thought that Baker did not have a firm objection to IWT's use of the term "Real News,"

and Baker honestly thought that he had communicated to Jay his firm objection to IWT's use of

the name.  (Id. at 289.)

40.  Although the Court finds both Jay and Baker to be – on the whole – credible and

honest witnesses, it is worth noting that Baker is heavily invested in RNP, just as Jay is heavily

invested in IWT, the organizations that they have founded.  Neither is an unbiased witness – both

individuals are passionate about the work of their organizations, and the importance of that work,

especially in a world where most (if not all) major media outlets have connections to for-profit

business conglomerates.  These passions may be noble, but they are passions nonetheless.

Although the Court does not find that either Jay or Baker has intentionally misled the Court, or

acted in bad faith in any way whatsoever, because both are interested witnesses, the Court is

disinclined to rely uncritically on the testimony of either witness where the testimony conflicts.

41.  Luke Montgomery also testified at trial, and the Court found his testimony to be

credible.  As he is no longer currently employed by or affiliated with IWT, he has less of an

interest in the outcome than do Baker and Jay.  Furthermore, insofar as Montgomery was willing

to express some beliefs that may have been perceived as critical to IWT (such as why he did not

like IWT's name), and other beliefs that may have been perceived as benefitting IWT, he came

across as an undoubtedly frank witness, who corroborates much of Jay's testimony.  Therefore,

the Court accepts Montgomery's testimony.

## LEGAL STANDARDS

<u>I.    Trademark Infringement and Unfair Competition</u>

42.    Real News alleges that IWT has engaged in unfair competition in violation of § 43(a) of the Lanham Act, codified at 15 U.S.C. § 1125(a), and New York's common law.  "Though enacted as part of the Trademark Act, [§ 43(a)] functions as a federal law of unfair competition for unregistered goods."  <u>Coach Leatherware Co., Inc. v. AnnTaylor, Inc.</u>, 933 F.2d 162, 168 (2d Cir. 1991).  RNP's marks are unregistered, and to succeed, it "must prove that its mark is entitled to protection and, even more important, that the defendant's use of its own mark will likely cause confusion with plaintiff's mark."  <u>Star Indus., Inc. v. Bacardi & Co. Ltd.</u>, 412 F.3d 373, 381 (2d Cir. 2005) (citation and internal quotation marks omitted); <u>accord</u> <u>ITC Ltd. v. Punchgini, Inc.</u>, 482 F.3d 135, 154 (2d Cir. 2007) ("<u>ITC I</u>").  Unregistered marks like RNP's are "entitled to protection . . . if [they] would qualify for registration as a trademark."  <u>Star Indus.</u>, 412 F.3d at 382.

43.    The New York common law claims are analyzed in tandem with the federal claims.  "It is well-established that the elements necessary to prevail on causes of action for trademark infringement and unfair competition under New York common law mirror the Lanham Act claims."  <u>Lorillard Tobacco Co. v. Jamelis Grocery, Inc.</u>, 378 F. Supp. 2d 448, 456 (S.D.N.Y. 2005) (internal quotation marks omitted); <u>see</u> <u>also</u> <u>Brooks ex rel. Estate of Bell v. Topps Co., Inc.</u>, No. 06 Civ. 2359, 2007 WL 4547585, at *8 (S.D.N.Y. Dec. 21, 2007).  "New York unfair competition law also requires a showing of actual confusion and bad faith before monetary relief may be awarded."  <u>Nabisco v. Warner-Lambert Co.</u>, 32 F. Supp. 2d 690, 702 (S.D.N.Y. 1999).

II.    Marks Entitled to Protection

44.    As a general rule, "[n]o trademark by which the goods of the applicant may be distinguished from the goods of others shall be refused registration on the principal register on account of its nature."  15 U.S.C. § 1052.  To be entitled to protection, "a mark must be sufficiently distinctive to distinguish the registrant's goods from those of others" by either being "inherently distinctive" or by having acquired a "secondary meaning" in the minds of consumers.  Louis Vuitton Malletier v. Dooney & Bourke, Inc., 454 F.3d 108, 116 (2d Cir. 2006) (citation and internal quotation marks omitted).  Distinctiveness is a matter of degree – a spectral rather than binary property – and marks can be categorized (in order of less distinctive to more) as generic, descriptive, suggestive, arbitrary, or fanciful.  Lane Capital Mgmt., Inc. v. Lane Capital Mgmt., Inc., 192 F.3d 337, 344 (2d Cir. 1999).

45.    On one end of the spectrum of distinctiveness are arbitrary and fanciful marks.  An arbitrary mark "applies a common word in an unfamiliar way" and a fanciful mark "is not a real word at all, but is invented for its use as a mark."  Id.  Arbitrary and fanciful marks are inherently distinctive, "[t]heir intrinsic nature serves to identify a particular source of a product, so they will be automatically protected."  Id.; Genesee Brewing Co., Inc. v. Stroh Brewing Co., 124 F.3d 137, 143 (2d Cir. 1997).  On the other end of the spectrum are generic marks.  A generic mark "is a common description of products and refers to the genus of which the particular product is a species," and are "not protectible."  Lane Capital Mgmt., 192 F.3d at 344 (citation omitted).

46.    A particular mark's distinctiveness depends not only on its language, but also on the context in which it is used.  Genesee Brewing, 124 F.3d at 147-48.  For example, HONEY

13

BROWN is generic in the context of ale beers, possibly descriptive in the context of lager beers, id. at 149, or wood stains, and probably suggestive or arbitrary in the context of grilling products, internet service providers, musical instruments, or paper products. And BROWN is at most descriptive of paint, but probably arbitrary in relation to mail service. See, e.g., Ellis v. United Parcel Service, Inc., – F.3d —, —, 2008 WL 1869553, at *6 (7th Cir. 2008) (noting United Parcel Service's ad campaign slogan "What can Brown do for you?").

  A. Descriptive and Suggestive Marks

  47. In this case, the central issue is whether plaintiff's marks are descriptive or suggestive. The line between descriptive and suggestive marks is "hardly a clear one," as "[t]he descriptive category almost imperceptibly shades over at its fringe into the suggestive domain." 2 McCarthy on Trademarks and Unfair Competition § 11:66, at 11-147 (4th ed. 2008) (hereinafter "McCarthy").

  48. Judge Weinfeld's formulation of the distinction between descriptive and suggestive marks is frequently applied in this Circuit: "A term is suggestive if it requires imagination, thought and perception to reach a conclusion as to the nature of the goods. A term is descriptive if it forthwith conveys an immediate idea of the ingredients, qualities or characteristics of the goods." Stix Products, Inc. v. United Merchants & Mfrs., Inc., 295 F. Supp. 479, 488 (S.D.N.Y. 1968). A descriptive mark describes the product in "ordinary language." Lane Capital Mgmt., 192 F.3d at 344.

  49. In distinguishing suggestive from distinctive marks, the Second Circuit has also considered the extent to which registering a mark would "render it difficult for [competitors] . . . adequately to describe their products." Aluminum Fabricating Co. v. Season-All Window Corp.,

259 F.2d 314, 317 (2d Cir. 1958); <u>Genesee Brewing</u>, 124 F.3d at 148 n.13. Judge Weinfeld went

on to note that "the test is whether the subject is so close and direct that it is apparently

descriptive and generally useful in approximately that form to all merchants marketing such

goods, or is so remote and subtle that it is fanciful and not needed by other merchants of similar

goods." <u>Stix Products</u>, 295 F. Supp. at 488 (citations and internal quotation marks omitted).

Registration of a suggestive mark, precisely because of the imaginative gap that exists between

the mark and the product, will have less of a "potential impact on competitors" than the

appropriation of a descriptive mark. <u>PaperCutter, Inc. v. Fay's Drug Co., Inc.</u>, 900 F.2d 558, 563

(2d Cir. 1990). Suggestive terms have less of an impact on competitors because they provide to

"prospective purchasers . . . an indication of source," rather than product. <u>Id</u>. at 562. While a

suggestive term is "a symbol of origin," a descriptive term can be "another form of

self-laudatory advertising." 2 McCarthy § 11:71, at 11-159.

 50. Another factor that may distinguish descriptive from suggestive marks is "the extent

to which other sellers have used the mark on similar merchandise," because "if others are in fact

using the term to describe their products, an inference of descriptiveness can be drawn." 2

McCarthy § 11:69, at 11-152; <u>see also</u> <u>Menashe v. V Secret Catalogue, Inc.</u>, 409 F. Supp. 2d

412, 423 (S.D.N.Y. 2006).

 B. <u>Secondary Meaning</u>

 51. A suggestive mark is deemed inherently distinctive because "[t]he connection

between mark and source is assumed," <u>20th Century Wear, Inc. v. Sanmark-Stardust Inc.</u>, 747

F.2d 81, 90 n.10 (2d Cir. 1984), and the mark's "intrinsic nature serves to identify a particular

source of a product," <u>Lane Capital Mgmt.</u>, 192 F.3d at 344. In contrast, descriptive marks are

not inherently distinctive, and "[t]o qualify for trademark protection, an owner of a descriptive mark must demonstrate that the mark had acquired secondary meaning before its competitor commenced use of the mark." Genesee Brewing, 124 F.3d at 143 n.4. Secondary meaning "performs the role of establishing [the] connection [between mark and source]." Lane Capital Mgmt., 192 F.3d at 344 (citation and internal quotation marks omitted). "A trademark acquires secondary meaning when the name and the business have become synonymous in the mind of the public, submerging the primary meaning of the term in favor of its meaning as a word identifying that business." Cadbury Beverages, Inc. v. Cott Corp., 73 F.3d 474, 479 n.3 (2d Cir. 1996) (internal quotation marks omitted); see Genesee Brewing, 124 F.3d at 143 n.4 (noting that secondary meaning exists where "the public is moved in any degree to buy an article because of its source"). Factors relevant to secondary meaning include advertising expenditures, consumer studies linking the mark to a source, unsolicited media coverage, sales success, attempts to plagiarize the mark and the length and exclusivity of the mark's use. ITC Ltd. v. Punchgini, Inc., 518 F.3d 159, 162 (2d Cir. 2008) ("ITC II") (citation omitted).

    C.    Further Principles

    52. The more distinctive a mark, the greater the protection it merits. The classification and weighting scheme is, at bottom, an attempt to "prevent consumer confusion concerning the source of goods," and to "encourage businesses to invest in quality goods by protecting their generated good will and customer loyalty from would-be imitators," balanced against the need "to avoid unduly impeding the free flow of information in the marketplace that results from exclusive appropriation of terms by particular businesses." PaperCutter, 900 F.2d at 562. Greater protection is given to "terms unrelated to the characteristics or class of the product"

because they are "less useful to competitors selling similar products and more likely to conjure up the source of the product" as opposed to the product itself.  Id.

53.  Classification of a mark is a "fact-bound determination."  Genesee Brewing, 124 F.3d at 144.  The "factual issue presented is how the purchasing public views the mark" and "the fact-finder's function is to determine, based on the evidence before it, what the perception of the purchasing public is."  Lane Capital Mgmt., 192 F.3d at 344.  The "relevant purchasing public is not the population at large, but prospective purchasers of the product."  Id. at 345 (citation omitted).

54.  Registration of a mark on the principal register "shall be prima facie evidence of the validity of the registered mark and of the registration of the mark, of the registrant's ownership of the mark, and of the registrant's exclusive right to use the registered mark. . . ."  15 U.S.C. § 1057(b).  A "decision by the USPTO to register a mark without proof of secondary meaning affords a rebuttable presumption that the mark is more than merely descriptive," Arrow Fastener Co., Inc. v. Stanley Works, 59 F.3d 384, 393 n.6 (2d Cir. 1995) (citations and internal quotation marks omitted), "and thus, that the mark is inherently distinctive," Lane Capital Mgmt., 192 F.3d at 345 (citation omitted).  Before a mark is registered, it is published for potential public opposition after a PTO examiner determines that the mark is sufficiently distinctive to be registered.  The initial conclusions of the PTO are not entitled to a "statutory presumption of validity," but are "nonetheless accord[ed] weight."  Genesee Brewing, 124 F.3d at 148 n.11; De

Beers LV Trademark, Ltd. v. DeBeers Diamond Syndicate, Inc., 440 F. Supp. 2d 249, 274 n.24 (S.D.N.Y. 2006).[10]

55. Even though the initial conclusions of the PTO are accorded weight, a plaintiff proceeding under § 43(a) of the Lanham Act has not yet conclusively established that its marks are sufficiently distinctive to merit protection. Courts applying the unfair competition provisions of § 43(a), and specifically §43(a)(1)(a), have required a plaintiff to establish the distinctiveness of the mark or trade dress at issue by a preponderance of the evidence. See McNeil-P.C.C., Inc. v. Bristol-Myers Squibb Co., 938 F.2d 1544, 1549 (2d Cir. 1991); Coach Leatherware, 933 F.2d at 167; Abercrombie & Fitch Stores, Inc. v. American Eagle Outfitters, Inc., 280 F.3d 619, 629 (6th Cir. 2002); see also Wal-Mart Stores, Inc. v. Samara Bros., Inc., 529 U.S. 205, 210 (2000); Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 768 (1992); cf. Lane Capital Mgmt., 192 F.3d at 345 ("[W]hen a plaintiff sues for infringement of its registered mark, the defendant bears the burden to rebut the presumption of mark's protectibility by a preponderance of the evidence.").

56. RNP's marks are not yet registered, and are therefore not entitled to the statutory presumption of validity. RNP seeks relief under Section 43(a) of the Lanham Act, and bears the burden of proving that its mark is distinctive as to the source of the good or service at issue. See ITC I, 482 F.3d at 154 (citations omitted). Although plaintiff may meet its burden by

_____

[10] The posture of this dispute is nearly identical to the posture of the dispute in Genesee Brewing, 124 F.3d 137. There, as here, the trademark examiner initially rejected plaintiff's trademark application, but subsequently reversed course after further submissions by plaintiff. Id. at 141. After reversing course, the trademark examiner then sent the application to publication, where it encountered opposition from defendant. Id. There, as here, the proceedings were stayed pending the outcome of the federal lawsuit. Id.

demonstrating secondary meaning, "logically that standard becomes more difficult to meet as the mark's descriptiveness increases." Yamaha Int'l Corp. v. Hoshino Gakki Co., 840 F.2d 1572, 1581 (Fed. Cir. 1988).

III.    Likelihood of Confusion

57.  To prevail on its trademark infringement claim, RNP must prove not only that its marks are entitled to protection, but also that IWT's allegedly infringing use creates "a probability of confusion, not a mere possibility, affecting numerous ordinary prudent purchasers." Star Indus., 412 F.3d at 383 (citation and internal quotation marks omitted). Likelihood of confusion "includes confusion of any kind, including confusion as to source, sponsorship, affiliation, connection, or identification," and the "public's belief that the mark's owner sponsored or otherwise approved the use of the trademark satisfies the confusion requirement." Id. at 383-84.

58.  Plaintiff has the burden of proving a likelihood of confusion by a preponderance of the evidence. McNeil-P.C.C., 938 F.2d at 1549; see also KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc., 543 U.S. 111, 120 (2004); ITC I, 482 F.3d at 154 (citations omitted); 4 McCarthy § 23:62, at 23-251-23-252.

59.  Whether likelihood of confusion exists in any particular case is determined by applying an eight-factor balancing test established by Judge Friendly in Polaroid Corp. v. Polarad Elecs. Corp.:

> Where the products are different, the prior owner's chance of success is a function of many variables: the strength of his mark, the degree of similarity between the two marks, the proximity of the products, the likelihood that the prior owner will bridge the gap, actual confusion, and the reciprocal of defendant's good faith

in adopting its own mark, the quality of defendant's product, and
the sophistication of the buyers.

287 F.2d 492, 495 (2d Cir. 1961); see also Star Indus., 412 F.3d at 384.

60.   Although the first three factors – strength, similarity of marks, and proximity of

products – are "perhaps the most significant in determining the likelihood of confusion," Mobil

Oil Corp. v. Pegasus Petroleum Corp., 818 F.2d 254, 258 (2d Cir. 1987), the "[a]pplication of the

Polaroid test is not mechanical," and "no one factor is necessarily dispositive, although any one

factor may prove to be so." New York Stock Exchange, Inc. v. New York, New York Hotel

LLC, 293 F.3d 550, 555 (2d Cir. 2002) (citation and internal quotation marks omitted).

Furthermore, the Polaroid factors "are not always dispositive" and "other factors may be added

or initial factors abandoned." Streetwise Maps, Inc. v. VanDam, Inc., 159 F.3d 739, 743 (2d Cir.

1998) (citations omitted).

### FINDINGS OF FACT: DISTINCTIVENESS OF THE MARKS[11]

61.   RNP claims that REAL NEWS[12] is properly classified as suggestive, not descriptive,

in the context of RNP's product – "news reporting services, namely, services for the production

and distribution of investigative journalism intended for adults." (PTX 58-60.) IWT claims that

the mark merely describes, in ordinary language, the qualities of RNP's product and that, absent

a showing of secondary meaning, the mark is entitled to no protection. This Court finds IWT's

position to be more convincing.

---

[11] As discussed above, the classification of any particular trademark is a finding of fact.
See Genesee Brewing, 124 F.3d at 144.

[12] RNP's other marks – REALNEWS and REAL NEWS PROJECT – are not
meaningfully different for this analysis.

I.  RNP's Marks are Descriptive, Not Suggestive

62.  "The line between descriptive and suggestive marks is quite a difficult one to draw, and new entrants to product markets often stray quite close to it."  PaperCutter, 900 F.2d at 563 (citation and internal quotation marks omitted).  This is such a case.  RNP insists that REAL NEWS is suggestive because the term "real" is ambiguous – that "while the term 'real' is an ordinary word found in the dictionary, it has a number of meanings and . . . does not convey any immediate or precise significance with respect to [RNP's] goods."  (Tr. 232-33.)  RNP's argument is ultimately unconvincing, because although REAL NEWS may not be a perfectly precise descriptor for plaintiff's product, it is a descriptor nonetheless, and it cannot be said on this record that the target audience would need any degree of "imagination, thought and perception to reach a conclusion as to the nature" of RNP's goods.

63.  The mark REAL NEWS is similar to REAL COFFEE, a mark refused registration on the primary register for being descriptive of "roasted ground and whole bean coffee [d]ecaf, organic, and regular."  Serial No. 78182860.  Coffee has many attributes, as the explosion of specialty coffee houses this past decade has demonstrated.  The beans from which it is brewed are grown in different countries, at different altitudes, and with different farming methods, and are stored, roasted, ground, and otherwise processed in different ways.  Although the phrase "real coffee" does not precisely convey the applicant's specific products in all of their particularities, it immediately conveys the idea that the product is "authentic" coffee.  The mark REAL BEER was also refused registration as a (suggestive) trademark for a brand of beer, because "[b]eer is the generic name of the goods and 'real' confirms that the beer is genuine."  Serial No. 78292114.  REAL BEER does not immediately and precisely convey how or with

which particular ingredients the beer is brewed, but it is nonetheless descriptive. Similarly, the

PTO has determined that the mark REAL FOOD is descriptive of "magazines featuring lifestyles

and organic foods," Serial No. 78556856, and the mark REAL ICE CREAM is descriptive of

"ice cream," Serial No. 76495765. See also In re Boston Beer Co. Ltd. P'ship, 198 F.3d 1370,

1372-74 (Fed. Cir. 1999) (upholding Trademark Trial and Appeal Board's decision that although

there is no universal standard against which beers are measured, THE BEST BEER IN

AMERICA is merely descriptive of beer because the mark is "simply a claim of superiority, i.e.,

trade puffery").[13]

64. Although there may be some gap between the term REAL NEWS and RNP's

particular product, "imagination, thought, and perception" is not required to connect the two.

Like the phrases "real beer" and "real coffee," "real news" is part of the common lexicon, a

phrase that target consumers of RNP's product would identify as referring to a particular quality

---

[13] RNP points to other news entities using the term "real news" to describe their news products (all of varying qualities or agendas) as proof that the term "real" is ambiguous or imprecise, and on that basis argues that an imaginative leap is required to get from the descriptor "real" to any particular news product. On this basis, RNP argues that it is entitled to monopolize the term. However, this argument is unconvincing. Some may think that wheat beers are not *real* beers, that decaffeinated coffee is not *real* coffee, or that reduced-fat ice-cream is not *real* ice-cream. It does not follow, however, that a marketer may monopolize the term as it applies to a certain subset of the product at issue because that subset does not fit a particular purveyor's view of what constitutes an authentic product. Analogously, simply because news organizations from all sides of the political spectrum may describe their products as "real" (as opposed to those who describe their products as adulterated or biased), RNP cannot monopolize the term as it applies to all news reporting services, to all services for the production and distribution of investigative journalism intended for adults (as RNP seeks in its trademark applications), or to some narrower subset that is viewed by RNP as in direct competition with RNP. (See Tr. 192, 246-47.) "Real" in this context is quintessentially a claim about the product, not its source, and on that basis it is descriptive. Moreover, contrary to RNP's argument, as noted above, the fact that "other sellers have used the mark" on their news media supports "an inference of descriptiveness." 2 McCarthy § 11.69, at 11-152.

of the product.  "Real News" directly conveys, in "ordinary language," <u>Lane Capital Mgmt.</u>, 192

F.3d at 344, "information about a product . . . other than information about its source or

association with a particular entity," <u>PaperCutter</u>, 900 F.2d at 564, namely that it is a news

product, providing authentic, accurate, and unbiased reporting.  As IWT's expert has noted,

numerous uses of "real news" "represent an attempt to describe a news service or a news product

as something that has unusual authenticity and credibility in opposition to some imagined, other

less credible and less authentic presentation of the news."  (Deposition of Paul Voakes, dated

November 16, 2007, at 69-70; <u>see</u> <u>also</u> Tr. 234.)[14]

    65.  Similar "ambiguities" exist in other descriptive terms, like "hot," <u>see</u> <u>Murphy v.</u>

<u>Provident Mut. Life Ins. Co.</u>, 923 F.2d 923, 927 (2d Cir. 1990), "supreme," <u>Supreme Wine Co.</u>

<u>v. American Distilling Co.</u>, 310 F.2d 888, 889 (2d Cir. 1962) ("Merely laudatory words, such as

'best', 'outstanding', or 'supreme' cannot of their own force indicate the source or origin of the

labeled goods."), "cozy-warm," <u>20th Century Wear, Inc. v. Sanmark-Stardust, Inc.</u>, 747 F.2d 81,

87-88 (2d Cir. 1984), and "best" or "premier," <u>In re Best Software, Inc.</u>, 58 U.S.P.Q.2d 1314,

1317 (T.T.A.B. 2001), but these terms are still properly classified as descriptive.  <u>See</u> <u>also</u>

---

    [14] RNP argues that this Court should defer to the PTO examiner's decision (upon
reconsideration) that the mark was sufficiently suggestive to be published for opposition.  The
"expertise of the trademark examiners does entitle their views to respectful consideration."
However, in the end the Court is "not bound" by such an initial determination, and is obligated
to ultimately render its own decision on the merits.  <u>D.M. & Antique Import Corp. v. Royal Saxe</u>
<u>Corp.</u>, 311 F. Supp. 1261, 1274 (S.D.N.Y. 1970).  In any event, the record demonstrates that the
examiner initially concluded that the marks were descriptive, and only published the mark for
opposition after RNP argued that it should be afforded the benefit of the doubt where the
descriptive/suggestive question is close.  Here, though, RNP has not suggested that it should be
afforded any such benefit.  Rather, it has acknowledged that, as the plaintiff, it bears the burden
of proof in establishing the validity of the marks.  (<u>See</u> Tr. 230.)  It is therefore far from clear
that, were the initial examiner to be presented with the question as it is presented to this Court,
his decision would differ from this Court's.

Burmel Handkerchief Corp. v. Cluett, Peabody & Co., 127 F.2d 318, 321, 29 CCPA 1024 (1942) (holding "Handkerchiefs of the Year" not distinctive, noting that "[s]uch a common expression which can indicate nothing but high quality surely would not be indicative of origin to the purchasing public"); 2 McCarthy § 11:17, at 11-29-11-30 ("Marks that are merely 'laudatory' and descriptive of the alleged merit of a product are also regarded as being 'descriptive.'"); but cf. Estee Lauder Inc. v. The Gap, Inc., 108 F.3d 1503, 1509 (2d Cir. 1997) ("A term that is merely self-laudatory, such as 'plus' or 'super,' seeking to convey the impression that a product is excellent or of especially high quality, is generally deemed suggestive.").

66.  Because "real news" is descriptive, numerous other news organizations incorporate the phrase to describe their products.  (See Expert Report of Paul Voakes, dated October 10, 2007; DTX A-11-A-23.)  Allowing RNP to monopolize the term would unduly burden other "news reporting services," including those who only produce and distribute investigative journalism.  Not only do many news organizations use the term "real" to describe their products, but in some instances the use of that term predates RNP's use of the term.[15]  (See, e.g., DTX A-12.)  RNP argues that, were it given exclusive use of the term "real news," its competitors would nonetheless have an infinite variety of ways to "talk about or to brand their product or service." (Tr. 252.)  However, this is so only because of the infinite number of arbitrary or fanciful marks that are always available to competitors to brand their products.  Trademark law does not sanction the monopolization of a descriptive term simply because present and future competitors could use arbitrary terms to brand their goods.  Similarly, trademark law does not sanction the

---

[15] Baker claims that he first used the marks REAL NEWS and THE REAL NEWS PROJECT in commerce on June 29, 2005, and first used the mark REALNEWS on February 6, 2006. (See PTX 58-60.)

monopolization of a clearly descriptive term merely because the English language contains at

least one synonym for that term.  As the Second Circuit has noted,

> The trademark law should not grant, in effect, a monopoly to the
> first mark that effectively and concisely describes a product's use
> or function.  Were this exclusive appropriation to occur, future
> entrants would be required to adopt a "less-descriptive" term, and
> engage in increased advertising to recoup the lost consumer
> appeal.  Entry barriers would be created, discouraging entry and
> competition, particularly from small firms.

Thompson Med. Co. v. Pfizer Inc., 753 F.2d 208, 217 (2d Cir. 1985); see also Genesee Brewing,

124 F.3d at 148 n.13.  The central question is how burdensome the deprivation of a particular

term would be to RNP's competitors and potential competitors.  In this context, monopolization

of the phrase "real news" would substantially burden other news providers and deprive them of a

commonly used shorthand description of their goods.

67.  For these reasons, this Court finds that REAL NEWS is descriptive of RNP's

claimed goods and services.  For the same reasons, REALNEWS is descriptive, as is at least a

portion of THE REAL NEWS PROJECT.[16]

68.  RNP points to other marks incorporating the term "real" that have been adjudicated

suggestive, such as THE REAL YELLOW PAGES.  See U.S. West Inc. v. BellSouth Corp., 18

U.S.P.Q.2d 1307, 1312 (T.T.A.B. 1990).  However, classification is an inherently fact-bound

determination, where context is everything, and any one particular classification, absent more, is

of "little probative value" in the context of another mark.  Id. at 1312 n.6.  There are fundamental

differences between REAL NEWS and THE REAL YELLOW PAGES.  First, while the

---

[16]  The Court expresses no opinion on whether THE REAL NEWS PROJECT would be
properly classified as suggestive were REAL NEWS disclaimed.

expression "real news" is part of the common lexicon, "real yellow pages" is not. The Trademark Trial and Appeal Board held that the mark "as a whole" did not "immediately decribe[]" the product being sold, id. at 1312, after citing the testimony of a witness who "did not know what the term 'real' meant as applied to telephone directories," id. at 1309. In contrast, members of the target audience here would understand that the term "real" operates as a claim regarding the news product's authenticity and lack of bias.

69. Second, to the particular target audience of BellSouth's yellow pages, the term "real" meant something very specific with respect to the source of the product, as the Board recognized. The mark was part of an effort to identify the yellow pages at issue as produced by "successors to portions of American Telephone and Telegraph Company (AT&T) and the Bell System, which underwent divestiture" in the mid 1980s. Id. at 1308. Before the divestiture of AT&T and the breakup of the Bell System, "yellow pages" classified directories universally originated from "the" telephone company. After divestiture, there was "a substantial increase in the number of independently published directories with over eight hundred being published in [the relevant] geographical area alone." Id. at 1309. The Board recognized that "it was applicant's intention to adopt a mark which distinguished the telephone directories of Southern Bell and South Central Bell from those of others." Id. at 1311. In that case and in that context, the term "real" meant something very specific about the source of the product (that it was published by the ex-monopolist and not the newcomers), and did not make a claim about the

product itself (that the telephone numbers in the ex-monopolist's directory were somehow more accurate or authentic than the numbers in the other directories).[17]

70. In any event, whether the Board classified the term as descriptive or as suggestive made no difference to the ultimate outcome of that case, as it was clear that THE REAL YELLOW PAGES had acquired secondary meaning for the target audience. Id. at 1312 (noting that the mark's owner had received millions of dollars in revenue from the sale of advertising space in its directories distributed under the mark, over 40 million copies of which were being annually distributed). In contrast, as discussed below, RNP has not produced evidence sufficient to demonstrate that the name REAL NEWS and RNP's business "have become synonymous in the mind of the public, submerging the primary meaning of the term in favor of its meaning as a word identifying that business." Cadbury Beverages, 73 F.3d at 479 n.3 (citation and internal quotation marks omitted).

---

[17] RNP lists other marks incorporating the term "real" that have been classified as at least suggestive. (See Letter of Diane M. Smith-Misemer, to the Court, dated April 14, 2008, listing, inter alia, REAL INVESTING, Registration No. 3308633, REAL KARAOKE, Registration No. 3295113, REAL SEARCH ENGINE SOLUTIONS, Registration No. 3383947, REAL MAGNET, Registration No. 3306676.) A court must be wary of rendering decisions based on superficial analysis of numerous other marks, as classification is an inherently fact-bound determination. U.S. West Inc., 18 U.S.P.Q.2d at 1312 n.6. However, it is worth noting that IWT points to an equally substantial compilation of marks incorporating the term "real" that the PTO has classified as descriptive. (See Letter of Jared D. Briant, to the Court, dated April 3, 2008, listing, inter alia, REAL FOOD, Serial No. 78556856, REAL PROTEIN, Serial No. 78114179, REALSWEET, Serial No. 78203007, REAL DIAPER ASSOCIATION, Serial No. 78543608, and REAL KICKBOXING, Serial No. 78494214, REAL ICE CREAM, Serial No. 76495765, REAL SUNGLASSES, Serial No. 76539703, REAL BEER, Serial No. 78292114, REAL GRANITE, Serial No. 78773493, and REAL DIAMONDS, Serial No. 78797407.) Although such generalized comparisons cannot substitute for detailed analysis, such a review confirms the Court's analysis, as RNP's marks fit more closely with those marks classified as descriptive than those classified as inherently distinctive.

## II.    RNP's Marks Have No Secondary Meaning

71.  RNP must establish that its marks acquired secondary meaning "before [IWT] commenced use of the mark." <u>Genesee Brewing</u>, 124 F.3d at 143 n.4.  RNP can do so by pointing to: "(1) advertising expenditures, (2) consumer studies linking the mark to a source, (3) unsolicited media coverage of the product, (4) sales success, (5) attempts to plagiarize the mark, and (6) length and exclusivity of the mark's use." <u>See</u> <u>ITC II</u>, 518 F.3d at 162 (citation and internal quotation marks omitted).  RNP has fallen far short of establishing secondary meaning.

72.  RNP has produced no evidence of advertising expenditures, and has produced no consumer studies linking the term REAL NEWS to RNP.  And although RNP proffers evidence that some of its articles were republished and discussed in other electronic databases or websites (<u>see</u> PTX 15, 19, 10, 22, 27, 63-67), it provides no evidence regarding the extent to which that coverage was solicited.  Moreover, even assuming that the coverage was unsolicited, it was far from extensive or sustained.

73.  Since RNP is a non-profit, website viewership and fund-raising success are an appropriate proxy for its "sales success."  RNP produces no evidence regarding the amounts raised through fund-raising and grant-writing, but it does submit evidence of the number of "unique visits" to its website from February 2006 to April 2007– spiking in February 2006 at just over 20,000, in June 2006 at just over 10,000, and in January 2007 at just under 60,000, and otherwise registering at somewhere between 2,000 to 8,000 visitors per month.  (See PTX 26.) In the context of the internet, where RNP's website is immediately available – at essentially no cost – to a target audience of millions, it is by no means clear that these numbers are

substantial.[18] RNP has not demonstrated any instances where its mark has been plagiarized. To plagiarize is "[t]o take and use as one's own the thoughts, writings, or inventions of another." XI Oxford English Dictionary 947 (2d ed. 1989). The evidence established at trial demonstrates that IWT independently developed the concept to incorporate "real news" into its brand, website, and flagship show, and its decision to continue in its efforts to brand itself as a purveyor of "real news" notwithstanding RNP's pending trademark application may have been many things, but it was not plagiarism.

74. Given this history, RNP has not proven that when customers hear the term "real news" they immediately think of the source of the product rather than the product itself. RNP has used the term for a relatively short period of time. Although as early as June 29, 2005, Baker identified himself as connected with The Real News Project, these identifications, nestled in the byline of sporadic articles, and one grant application were the only conceivable uses of the term in commerce prior to the launch of the website in February 2006. Immediately after RNP launched its website, and before RNP had even applied for trademark protection, IWT informed RNP of its intentions to launch its own "real news" project.

75. Therefore, this Court finds as a matter of fact that RNP has not demonstrated the existence of secondary meaning before IWT began using the term "real news." Indeed, RNP has come nowhere close to establishing that the mark REAL NEWS has acquired secondary meaning at any point in time.

_____

[18] Neither side has produced any detailed evidence regarding the specific size, or other demographic characteristics, of its target audience.

## CONCLUSION OF LAW: DISTINCTIVENESS OF MARKS

76.  Since RNP has made no showing of secondary meaning, whether its marks are entitled to protection as valid trademarks depends on whether they are suggestive or descriptive. For the reasons stated, they are descriptive, and on that basis RNP's claims against IWT must fail.

## FINDINGS OF FACT: LIKELIHOOD OF CONFUSION[19]

77.  Assuming arguendo that the marks were suggestive (and they are not), RNP still could not prevail, as a review of the eight-factor <u>Polaroid</u> test demonstrates that IWT's use of the mark will not likely cause confusion with RNP's mark.

I.  <u>Strength of Mark</u>

A.  <u>Legal Standard</u>

78.  The strength of the mark depends on its distinctiveness, <u>Playtex Prods., Inc. v. Georgia-Pacific Corp.</u>, 390 F.3d 158, 163 (2d Cir. 2004), "its power to identify the source of a product," <u>Time, Inc. v. Petersen Pub. Co. LLC</u>, 173 F.3d 113, 117 (2d Cir. 1999) (citation omitted).  <u>See</u> <u>Lang v. Ret. Living Pub. Co.</u>, 949 F.2d 576, 581 (2d Cir. 1991) (noting that "the strength of the mark turns on its origin-indicating quality[] in the eyes of the purchasing public" (internal quotation marks omitted)).  The more distinctive a mark, the more protection it

---

[19] As already discussed, whether the coexistence of two marks would likely cause confusion in the marketplace depends on an eight-factor balancing test established by Judge Friendly.  <u>See</u> <u>Polaroid Corp.</u>, 287 F.2d at 495.  The determination of any one factor is properly classified as a finding of fact (and reviewed by the Court of Appeals with deference), but the balancing of the marks is properly classified as a conclusion of law (and reviewed by the Court of Appeals <u>de novo</u>).  <u>See</u> <u>Playtex Prods., Inc. v. Georgia-Pacific Corp.</u>, 390 F.3d 158, 162 (2d Cir. 2004).  For the reader's convenience, this section will integrate certain conclusions of law along with findings of fact.  These conclusions of law will be stated "separately," as mandated by Rule 52(a), Fed. R. Civ. P.

deserves. <u>Lane Capital Mgmt.</u>, 192 F.3d at 344; <u>TCPIP Holding Co., Inc. v. Haar Communications, Inc.</u>, 244 F.3d 88, 93 (2d Cir. 2001).

B.    <u>Factual Findings</u>

79.   Assuming that RNP's marks were sufficiently distinctive to cross the line from descriptive to suggestive, they would "just barely" do so, as the "degree of thought" required to connect the product to the marks is "minimal." <u>See</u>, <u>e.g.</u>, <u>Star Indus.</u>, 412 F.3d at 385.  Even if the marks had enough "inherent distinctiveness . . . [to] invest[] [them] with some strength, [citation omitted], all of the relevant factors combine to indicate that the mark[s] [are] weak." <u>Id</u>. at 385-86.

80. This Court finds as a matter of fact that, were RNP's marks properly classified as inherently distinctive, they would be on the very weakest edge of the spectrum of inherently distinctive marks.  This factor strongly favors IWT.

II.    <u>Similarity</u>

A.    <u>Legal Standard</u>

81.   The similarity between two marks is based on the "overall impression on a consumer, considering the context in which the marks are displayed and the totality of factors that could cause confusion among prospective purchasers." <u>Louis Vuitton</u>, 454 F.3d at 117 (citation and internal quotation marks omitted).  "Utilizing a side-by-side comparison can be a useful heuristic means of investigating similarities and differences in . . .  respective designs, so long as a court maintains a focus on the ultimate issue of the likelihood of consumer confusion." <u>Id</u>. (citation and internal quotation marks omitted, alteration in original).  "[A]n inquiry into the degree of similarity between two marks does not end with a comparison of the marks

31

themselves," and "the setting in which a designation is used affects its appearance and colors the impression conveyed by it." Savin Corp. v. Savin Group, 391 F.3d 439, 458 (2d Cir. 2004) (citations and internal quotation marks omitted).

B.    Factual Findings

82.    Obvious basic similarities exist between the marks and phrases at issue: both websites prominently incorporate the term REAL NEWS on the upper left hand corner of the website, and the website addresses prominently incorporate the phrase "realnews" – RNP's domain name is realnews.org; IWT's domain names are realnews.com, therealnews.com, therealnewsnetwork.com, and getrealnews.com.  (PTX 56; DTX B-3.)  Since variations in font and capitalization have no effect on domain names, website addresses can have no meaningful difference in text, typeface, or general appearance.  The marks and addresses are therefore very similar.  Moreover, an internet search of "real" and "news" would likely return both RNP's and IWT's websites as prominent results.  However, such a search would also return other news websites of sufficiently differing agendas and formats to put an average viewer on notice that they should take some care to ensure that the desired site is properly identified.[20]

---

[20] For example, "The Real News 24/7" (DTX A-20) also incorporates the term "real news" and markets the site as an independent media provider free of corporate influence.  See Real News 24/7, http://www.realnews247.com/ (last visited May 20, 2008) ("The Independent Press is 'David' and the Big Five TV Networks are 'Goliath.'").  The domain name, realnews247.com, shares basic similarities with IWT's and RNP's domain names, and is a prominent result in most internet searches.  However, a quick perusal of the website reveals substantial differences in both format and content such that an average reader could not easily confuse this website with RNP's or IWT's websites.  For example, "The Real News 24/7" is interested in helping "to peacefully restore true Constitutional freedoms under God, and avert the encroaching nightmare agenda of the Judeo-Masonic Ruling Elite" and in promoting the view "that sincere and godly prayer is the foundation of all constructive action."  Id. at http://www.realnews247.com/no_ordinary_website.htm.

83. Once the websites are accessed, however, the marks are displayed in a different manner, and in a different context. First, the taglines are different. RNP's website prominently displays the phrase "The Real News Project, News that Matters;" IWT's website prominently displays the phrase "The Real News Network, The Future Depends on Knowing." Second, the visual display of these taglines are different. RNP's website displays the tagline in a simple conventional script, colored black on a white background, with conventional capitalization and a graphic to the left of the phrase depicting a magnifying glass revealing two miniature individuals that walk the page of an open book full of indecipherable data. In contrast, IWT's website displays the term "The Real News Network" as a graphic in itself, with different words in the phrase different colors (and different orientations), and spaced and sized in an unconventional manner. Third, the visual display of the websites are different – with substantially different color schemes and layouts. For example, the primary colors of RNP's website are blue and white. In contrast, the primary colors of IWT's website are yellow and black. The center of RNP's website's landing page links to an extensive article written on October 18, 2007. In contrast, the center of IWT's website's landing page links to video of "breaking news." Fourth, the nature of the products is also different, although this issue will be discussed in greater detail in the next subsection.

84. Evaluated as a whole, the websites are sufficiently different to put an average viewer of the target audience on notice that the particular goods and services offered are quite different. This Court therefore finds that enough similarities between the marks and the products ultimately tip the scales in RNP's favor, but enough differences exist to prevent them from tipping overwhelmingly.

III.   Proximity of Service

    A.   Legal Standard

85. The closer in proximity the products are in the market place, the more likely the possibility of confusion between the products. This factor in the Polaroid analysis "concerns whether and to what extent the two products compete with each other." Cadbury Beverages, 73 F.3d at 480. In order to make such a determination, courts must look at "the nature of the products themselves and the structure of the relevant market," including "the class of customers to whom the goods are sold, the manner in which the products are advertised, and the channels through which the goods are sold." Id. (citation and internal quotation marks omitted).

    B.   Findings of Fact

        1.   Product Comparison

86. The products are similar in that they are news websites providing subscription-free authentic/alternative news services. One central difference between the two products is that IWT's site focuses on daily news and analysis, whereas RNP's site focuses on news features that are investigative, reflective, and analytical. According to Jay, the "fundamental thing [IWT] is trying to do is daily news." (Tr. 188.) IWT has focused on providing "independent daily breaking news and analysis." (Id.) It is "in the moment when a story first breaks and everyone runs to their TV, that's when people form their ideas," and "[i]t is not enough to read about it. You have to see it." (Id. 188-89.) In contrast, RNP produces investigative pieces that take longer to create. For example, the investigation for RNP's first article "involved interviews with several hundred sources, the collection and examination of thousands of pages of documents from disparate repositories, and extensive travel." (Baker Aff. ¶ 21.) RNP can devote "hundreds

of hours [in] . . . investigative journalism efforts" to any one story.  (Id. ¶¶ 43-45.)  In contrast to

the IWT website, which appears to be updated daily, the RNP website's most recent feature (still

featured prominently on its site) is dated October 18, 2007.

87.  A second central difference between the products is that RNP's website is primarily

text-based and IWT's website is primarily video-based.  IWT's flagship show, The Real News, is

a video production.  This basic difference mandates fundamental differences in how the products

convey information.  In video-based news (as compared to text-based news), less information is

conveyed by words, and much (if not most) information is conveyed by images.  Furthermore, to

the extent words are used, they are spoken as opposed to written.  Video-based news requires a

different production process, and sometimes requires enhanced hardware, software, and services

for the average internet user.  While video-based internet news sources necessitate strong

internet connections, as well as multimedia software and hardware, text-based internet news

sources can be accessed on a less reliable connection and with a more simple machine.

### 2.    Target Audience

88.  It is far from clear that RNP and IWT share the same target audience.  RNP has

admitted in this proceeding that its target is "likely to be somewhat sophisticated."  (P. Pretrial

Mem. 16.)  In contrast, IWT is trying to reach a "mass audience," "trying to compete with

CNN," and is "not trying to go for an audience of people who are sophisticated, [and] read stuff

on the blogs," but instead is reaching out to the "80 percent of people [who] still get their news

from television."  (Tr. 186.)  Neither party, however, has produced any hard evidence

demonstrating the extent to which RNP's target audience overlaps with IWT's target audience,

or the extent to which RNP's target audience views text and video-based sources with

indifference.  Because the products are sufficiently different in nature, though, the Court can reasonably infer, and so finds, that the respective target audiences are not identical.

        3.     Submarkets

89.  Absent any other specific evidence, it is reasonable to conclude, and the Court so finds, that these products "reside in distinct submarkets of the market" for internet-based subscription-free news sources.  See, e.g., Star Indus, 412 F.3d at 387 (finding that flavored vodka and flavored rum reside in distinct submarkets of the market for alcoholic beverages). The products are marketed to customers that share at least one similarity (an interest in independent/alternative news) in the same location (the internet) and are therefore are in some form of competitive proximity.

90.  Therefore, this Court finds as a matter of fact that the products are distinct and exist in distinct submarkets.  The "finding of competitive proximity is thus tempered, and the factor does not overwhelmingly favor" RNP.  Id.  Here, this factor counts in RNP's favor, but not strongly.

## IV.    Bridging the Gap

91.  Since the products are in competitive proximity, the bridging the gap factor is irrelevant to the Polaroid analysis, see Patsy's Brand, Inc. v. I.O.B. Realty, Inc., 317 F.3d 209, 218 (2d Cir. 2003), as "there is really no gap to bridge."  Star Indus, 412 F.3d at 387 (citations omitted).  This factor is therefore "neutral" in the analysis.

V.    Consumer Confusion

    A.    Legal Standard

92.  Although "actual confusion need not be shown to prevail," Lois Sportswear, U.S.A.
v. Levi Strauss & Co., 799 F.2d 867, 875 (2d Cir. 1986), "[t]here can be no more positive or
substantial proof of the likelihood of confusion than proof of actual confusion," Savin Corp., 391
F.3d at 459.  A plaintiff's failure to submit a consumer survey weighs against a finding of
consumer confusion, Star Indus, 412 F.3d at 388, because the "absence of surveys is evidence
that actual confusion cannot be shown," Sports Authority, Inc. v. Prime Hospitality Corp., 89
F.3d 955, 964 (2d Cir. 1996) (citations omitted).  However, evidence of surveys is not necessary,
and a "trier of fact may still conclude that actual confusion exists in the absence of such
evidence, so long as there is other evidence of actual confusion." Id. (citation omitted).  A
plaintiff may submit anecdotal evidence of confusion, but the evidence must be more than de
minimis.  Nora Bevs. v. Perrier Group of Am., 269 F.3d 114, 124 (2d Cir. 2001).  Mere
"[i]nquiries about the relationship between an owner of a mark and an alleged infringer do not
amount to actual confusion" as "such inquiries are arguably premised upon a lack of confusion
between the products such as to inspire the inquiry itself." Id.  To show actual confusion, RNP
must demonstrate that IWT's use of the term real news "could inflict commercial injury in the
form of either a diversion of sales, damage to goodwill, or loss of control over reputation."
Sports Authority, 89 F.3d at 963.

    B.    Findings of Fact

93. As evidence in support of its claims of actual confusion, RNP proffers an email from
a member of the public inquiring whether RNP was the "same organization that Paul Jay has

launched as Independent World Television," and noting that "[i]f so, I would like to contribute" (PTX 11).  RNP also proffers an email from an IWT donor asking whether IWT and RNP were the same organization.  (PTX 57.)  Baker also testifies that he "regularly receive[s] inquiries asking if IWT and [RNP] are the same entity."  (Baker Aff. ¶ 52.)  This evidence does not weigh in favor of plaintiff, as mere "[i]nquiries about the relationship between an owner of a mark and an alleged infringer do not amount to actual confusion."  Nora Bevs. v. Perrier Group of Am., 269 F.3d 114, 124 (2d Cir. 2001).

94.  RNP also relies on Baker's testimony that he attended a conference in January 2008 where he "continuously encountered people who were confused between" RNP and IWT. (Baker Aff. ¶¶ 54-55.)  This testimony is "extremely week" as it is "testimony by . . . [an] interested witness recounting a handful of anecdotes, including a number of hearsay statements by unidentified and unidentifiable declarants."  Star Indus, 412 F.3d at 388.  This is particularly so given that Baker's testimony is conclusory and speculative in attributing a "confus[ed]" mental state to his interlocutors.  Baker also testified about a December 2006 blog post that "perfectly melded" IWT and RNP into one.  (Baker Aff. ¶ 51.)  However, he does not provide a printout of the post, and it is not clear from the affidavit whether he personally saw the blog post. For that reason, the Court discounts this evidence.

95.  Baker also testifies that he "regularly . . . receive[s] emails intended for the other Real News."  (Baker Aff. ¶ 52.)  However, to the extent that those emails could have been introduced but were not, the Court substantially discounts that evidence.

96.  Baker also testified that (I) Earl Katz confused RNP's organization for IWT's organization when he reminded Baker that Baker had appointed Katz to RNP's board, when in

fact Katz had been appointed to IWT's board (Baker Aff. ¶ 49), (ii) at a wine and cheese event associated with IWT, Amy Goodman told Baker that they thought that he was "working with IWT" (id. ¶ 50), and (iii) David Neubert mistakenly confused an email sent by IWT as an email sent by RNP (id. ¶ 53). Although these individuals are identifiable, none submit affidavits or declarations supporting these contentions, and therefore the Court substantially discounts this evidence.

97. RNP also submits evidence of confusion from potential job applicants. RNP proffers the job application of someone interested in "a broadcast, anchor or production position at Real News," noting her experience with "television radio and print on local and national events." (PTX 52.) However, it is far from clear that this applicant intended to apply to IWT (the party notes her experience in print journalism) as opposed to RNP – or any other news organization who may hire a young journalist trying to make her way in a competitive industry. Therefore, the Court does not consider this evidence to be credible evidence of confusion.

98. RNP does, however, proffer an email written from a Ugandan journalist to Baker, asking whether the journalist could write for RNP on a freelance basis, noting that he learned about RNP from a stand at a conference in Toronto presumably run by IWT and not RNP. (PTX 49.) This evidence is properly admitted as evidence of confusion by a prospective job applicant. It is reasonable to conclude that the Uguandan journalist thought that RNP's website was in fact being run by IWT, and that he contacted Baker via a link from RNP's website.

99. RNP submits evidence of confusion by media professionals. RNP proffers the testimony of Lee Mintz and William Densmore, who attended a media reform conference in Memphis in 2007. As Russ Baker handed out leaflets labeled "Real News," Lee Mintz

mistakenly assumed that Baker was Paul Jay, the founder of IWT. (Deposition of Lee Mintz, dated October 10, 2007, at 39-40.) When invited to "The Real News happy hour," William Densmore mistakenly assumed that it was to be hosted by RNP and Russ Baker, but in fact it was hosted by Paul Jay and IWT. (Deposition of William Densmore, dated October 16, 2007, at 10-11, 31-32.) This evidence is properly admitted as evidence of confusion by media professionals. However, this evidence must be somewhat discounted, as the various anecdotes of confusion arise from situations in which the average member of the target audience would not find himself.

100. RNP submits an email from a journalism professor to Baker describing her confusion regarding "[two] news distributors called real news" (PTX 53), and a comment from the Huffington Post website describing IWT's website as the "Real News project" (PTX 51). This evidence is also properly admitted as evidence of confusion by media professionals.

101. Critically, though, RNP has not put forward any direct evidence of confusion of members of the target audience between the two particular products at issue – the websites.

102. RNP submits evidence that, on the basis of an email sent by Baker inquiring about grant programs for RNP, someone at the MacArthur Foundation mistook Baker's organization for Jay's organization. (PTX 54.) Although this anecdote is evidence of confusion of some sort, it is not evidence that strongly weighs in RNP's favor. The anecdote does not demonstrate, or suggest, that, had the MacArthur Foundation received a full application from RNP, it would have failed to consider that application on the basis of a prior or simultaneous application submitted by IWT. In fact, Baker testified that, upon examining RNP's website, the MacArthur Foundation representative expressed interest in Baker's project. (Tr. 124.) Baker testified that

RNP ultimately chose not to apply for a grant not because of any actual confusion by the

MacArthur Foundation between the two projects or websites, but because of this "whole

complicated legal scenario." (Id.)

103.  This Court therefore finds as a matter of fact that, as a whole, RNP's evidence of

actual confusion is anecdotal and weak.  RNP has not provided any substantial or systematic

direct evidence identifying actual confusion by members of its target audience or by donors and

philanthropic organizations when comparing the IWT's goods and services with RNP's.

Therefore, this factor favors IWT.

VI.     Bad Faith

A.      Legal Standard

104.  Bad faith "generally refers to an attempt by a junior user of a mark to exploit the

good will and reputation of a senior user by adopting the mark with the intent to sow confusion

between the two companies' products." Star Indus., 412 F.3d at 388 (citation omitted).  This

inquiry "considers whether the defendant adopted its mark with the intention of capitalizing on

the plaintiff's reputation and goodwill and on any confusion between his and the senior user's

product." Savin Corp., 391 F.3d at 460 (citation, internal quotation marks, and alterations

omitted).  "Selection of a mark that reflects the product's characteristics, request for a trademark

search and reliance on the advice of counsel are factors that support a finding of good faith."

Star Indus., 412 F.3d at 388.

B.      Findings of Fact

105.  Here, the overwhelming evidence supports a finding of good faith.  Jay and the

other members of IWT developed the concept to incorporate the "real news" into their branding

independent of RNP. The term was developed precisely because Jay and his colleagues thought that it was descriptive of their product. Jay testified that he had been in a taxi cab, and was asked by its driver what Jay did for a living. (Jay Aff. ¶ 7.) Jay explained, and the driver responded "so you do the real news." (Id.) In Montgomery's discussions with Jay about rebranding IWT, Jay "told that story about the cab driver, your average Joe summing up what he was talking about," and to Montgomery's mind "nothing stood out as [much] as that . . . plain spoken average everyday way of saying it." (Tr. 158.) It is unsurprising that two news organizations developed the phrase independently, as use of the term in the context of news providers is by no means path-breaking. (See Jay Aff. ¶ 14.) IWT also consulted trademark attorneys in both Canada and the United States, and was cautioned that "if IWT wanted to use the mark THE REAL NEWS, it would be unable to protect it given its descriptive nature." (Jay Aff. ¶ 17.)

106. IWT ran trademark searches in Canada and the United States. (Jay Aff. ¶ 20; Tr. 167.) Those searches did not uncover RNP's marks, as RNP had not yet applied to the PTO for registration of those marks. IWT also ran repeated internet searches to identify individuals using the term "real news" (Montgomery Aff. ¶ 10; Jay Aff. ¶ 12), and when IWT discovered users of the phrase, it informed them of its intentions to use the same phrase (Jay Aff. ¶ 16). For example, Jay contacted Baker as soon as he discovered Baker's website – the day after RNP's website had been launched, and before Baker had even filed his trademark applications. After discovering RNP's website, IWT again consulted attorneys in Canada and the United States, who reaffirmed that "the phrase 'real news' could not be trademarked as it was descriptive." (Jay Aff. ¶ 22.) Whether that advice was ultimately correct (as this Court has held), it was not

patently erroneous, and IWT's decision to rely on that evidence supports a finding of good faith in its dealings with RNP.[21]

107.   The testimony of Baker and Montgomery was credible, and neither acted in bad faith.  Moreover, this Court finds as a matter of fact that IWT has not attempted to capitalize on RNP's brand or good will.  RNP was a fledgling organization at the time, and had far from established itself or its product.  At most, the record reflects IWT's stubborn insistence that it could not be legally prevented from using the phrase "real news."  Stubbornness, though, is not bad faith.  Again, this factor strongly tips in IWT's favor.

---

[21] RNP points to IWT's trademark application for THE REAL NEWS as evidence that IWT thought that the mark was protectable.  (PTX 62; Tr. 179-80.)  RNP also points out that IWT's website states that IWT's various marks, including "Real News," are "trade marks and service marks of IWT TV."  (Tr. 180-82.)  Jay however, explained that IWT applied for trademark protection, "frankly to get [the mark] rejected."  (Id. 193.)  In other words, the rejection of IWT's application was confirmation of IWT's "opinion on the words Real News." (Id. 194.)  According to Jay, the application was also to put the PTO on notice that IWT objected to Baker's trademark application.  (Id. 204.)  Jay's testimony on this point was perfectly credible, and demonstrated no bad faith.  Similarly, it was appropriate for IWT to take the position that they believed REAL NEWS was not a valid suggestive mark, but at the same time, as backup, to purchase a potentially senior user of the mark and continue to assert whatever rights that senior user had asserted.

RNP does not take issue with the fact that the IWT board essentially asked the permission of Rob Glazer of Real Networks before they finally approved the name "Real News." (Jay Aff. ¶¶ 27, 29; PTX 10.)  However, this does not demonstrate that IWT thought that Real Networks would be legally entitled to prevent IWT from using the term REAL NEWS if it so chose.  At most, it demonstrates that IWT recognized that Glazer could make it costly for IWT to exercise what it believed were its legal rights.

VII.    Respective Quality of the Products

    A.    Legal Standard

    108.  The quality factor "is primarily concerned with whether the senior user's reputation

could be jeopardized by virtue of the fact that the junior user's product is of inferior quality."

Star Indus., 412 F.3d at 389 (citation and internal quotation marks omitted).

    B.    Findings of Fact

    109.  The record does not demonstrate that IWT's website is inferior in quality to RNP's

website.  RNP's central concern appears to be less that IWT's product is of inferior quality, but

that it is not in fact independent, and the mistaken affiliation between the two "tars [RNP] with a

partisan brush."  (Baker Aff. ¶ 54.)  Baker testified that "despite IWT's talk about objectivity,

much of what IWT offers is conventional opinion and superficial analysis, often one sympathetic

to identifiable political factions and politicians."  (Id. at ¶ 40.)  However, absent more,

generalized assertions such as these cannot support a finding that IWT's product is in fact

inferior.  RNP has come nowhere near to demonstrating that its product is more or less

independent than IWT's product.  The mere fact that IWT's analysis may differ from RNP's

analysis does not conclusively prove that IWT's product is inferior,[22] and this factor cannot

count in RNP's favor.  It would be unfair to compare the time it takes for IWT to produce a

video-clip with the time it takes for RNP to write a feature, as in order to be responsive to

---

    [22] In any event, were IWT's website removed, RNP would still have to contend with
other news websites offering "objective and independent" news whose views of objectivity and
independence differ significantly from RNP's views.  See, e.g., Real News 24/7,
http://www.realnews247.com/ (last visited May 20, 2008).  Therefore, the risk of being "tarred
with a partisan brush" exists regardless of whether IWT's site is functional, or of what IWT calls
itself.

breaking news, RNP's product must be produced on a shorter time-frame. In short, the services aspire to do different things; neither is an inferior version of the other.

110. This Court finds as a matter of fact that RNP has not demonstrated that its product is superior to IWT's product. Likewise, IWT has not demonstrated that its product is superior to RNP's product. Therefore, this factor counts in neither party's favor, and is properly classified as "neutral" in the <u>Polaroid</u> analysis.

VIII. <u>Sophistication of Consumers in the Relevant Market</u>

    A.    <u>Legal Standard</u>

111. "[T]he likelihood of confusion between the products at issue depends in part on the sophistication of the relevant purchasers." <u>Cadbury Beverages</u>, 73 F.3d at 480 (citation internal quotation marks omitted). "The more sophisticated the consumers, the less likely they are to be misled by similarity in marks." <u>TCPIP Holding</u>, 244 F.3d at 102. Consumer sophistication "consider[s] the general impression of the ordinary purchaser, buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods." <u>Sports Auth.</u>, 89 F.3d at 965 (citation, internal quotation marks, and alterations omitted). Sophistication may be proved "by direct evidence such as expert opinions or surveys," and "[i]n some cases" by indirect evidence such as by inferring characteristics of consumers based on "the nature of the product or its price." <u>Star Indus.</u>, 412 F.3d at 390 (citation omitted).

    B.    <u>Findings of Fact</u>

112. Although neither party provides any direct evidence regarding the target audience, RNP concludes, based on the nature of the products, that the target customer of both RNP and

IWT "is the web user looking for depth in journalism, a consumer that is likely to be somewhat sophisticated." (P. Pretrial Mem. 16.)  In contrast, IWT has asserted that it is focused on more of a "mass audience." (Tr. 186.)

113.  It is reasonable to infer from RNP's articles – both in terms of the style in which they are written, and the subject matter that they address – and this Court so finds, that RNP's target customers, as a whole, are educated and somewhat sophisticated.

114.  Although RNP acknowledges that its consumers are sophisticated, it insists that their sophistication is mitigated by the fact that the marks and services are "identical." (P. Pretrial Mem. 16.)  Here, the marks are similar, but there are fundamental differences between the RNP and IWT services, as this Court has already found.  It would be difficult for a sophisticated consumer to confuse a website producing daily video content reporting on breaking news with a website that primarily produces infrequent, but substantial, pieces of journalism.

115.  Of course, the absence of direct confusion does not prevent a finding of "associational confusion." Star Indus., 412 F.3d at 390.  Associational confusion occurs not when the consumers are incapable of distinguishing one product from another, but when the products are nonetheless connected in the minds of the consumers on the assumption that there must be a "licensing or sponsorship agreement" or other connection between the alleged infringer and the mark holder. Id.  In other words, in the case of "associational confusion," the harm is not the likelihood that a purchaser would purchase a product on the mistaken belief that it was produced by the markholder, but "rather, . . . the likelihood that a consumer, hearing the [allegedly infringing] name and thinking it had some connection with [the markholder], would consider it on that basis." Grotrian, Helfferich, Schulz, Th. Steinweg Nachf. v. Steinway &

Sons, 523 F.2d 1331, 1342 (2d Cir. 1975). Although RNP submits evidence that people in a small circle may connect the "real news" to RNP's organization or value Baker's reputation as a journalist, it is by no means clear that the target consumer would have any clue what the RNP is or does or link IWT's website with RNP's brand.

116.  On the basis of the record, it is reasonable to infer, and the Court so finds, that the average (sophisticated) consumer would generally be expected to understand that IWT's use of the term "real news" was intended to indicate a quality of the journalism to be found on its website, and not to indicate a marketing, sponsorship, or licensing arrangement with RNP. See Star Indus., 412 F.3d at 390.

117.  The Court finds as a matter of fact that sophisticated consumers would not confuse RNP's product with IWT's product. This factor therefore counts in IWT's favor.

### CONCLUSION OF LAW: BALANCING THE POLAROID FACTORS

118.  In sum, four factors favor IWT (strength of the mark, actual consumer confusion, bad faith, consumer sophistication), two factors favor RNP (similarity, competitive proximity), and two are neutral (bridging the gap, and quality). On the whole, and taking everything into account, the balance favors IWT. Not only do more factors favor IWT than RNP, but those factors favoring IWT tip more strongly in IWT's direction than the remaining non-neutral factors tip in RNP's direction.

### CONCLUSION

For the reasons stated, on the basis of the record developed at trial, RNP has failed to prove that its marks are distinctive. Were they held to be distinctive, they would barely be distinctive, and RNP has failed to demonstrate likelihood of confusion between RNP's and

IWT's marks and services. Accordingly, it is hereby ORDERED that judgment be entered in

favor of IWT on all counts.

SO ORDERED.

Dated: New York, New York
     May 27, 2008

GERARD E. LYNCH
United States District Judge